UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KENNETH H. WOODSON O/B/O M.K.W.,          :
                                          :
                    Plaintiff,            :
                                          :          **OPINION AND ORDER**
           -against-                      :          15-CV-1877 (DLI)
                                          :
NANCY A. BERRYHILL,[1]                     :
Acting Commissioner of Social Security,   :
                                          :
                    Defendant.            :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

Initially[2] appearing *pro se*, Mr. Kenneth H. Woodson ("Mr. Woodson") filed an application

for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), on behalf of

his minor son, M.K.W. ("Plaintiff"), on December 27, 2012, when Plaintiff was seven years old.

*See* Certified Administrative Record ("R."), Dkt. Entry No. 27 at 150-58.[3] The Social Security

Administration (the "SSA") denied Plaintiff's application on February 20, 2013, and Mr. Woodson

requested a hearing before an administrative law judge *Id*. at 82, 97. After holding hearings on

January 21, 2014 and July 15, 2014, Administrative Law Judge Michael Dominic Cofresi (the

"ALJ") issued an opinion on August 12, 2014 (the "Decision") concluding that Plaintiff was not

disabled within the meaning of the Act. *Id*. at 4-35 On February 2, 2015, the Decision became the

Commissioner's final decision when the Appeals Council denied Plaintiff's request for review

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Therefore, the Court has substituted her as the named Defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] Plaintiff currently is represented by counsel in this appeal. He appeared *pro se* before the ALJ.

[3] The application was given a protective filing date of December 14, 2012. R. at 171.

after considering Plaintiff's case in accordance with the terms of the class action settlement agreement in *Padro v. Colvin*. *Id*. at 1-3. This appeal followed.

On April 3, 2015, Plaintiff filed the instant action seeking judicial review of the denial of benefits. *See* Complaint, Dkt. Entry No. 1. On November 4, 2015, the Commissioner moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, seeking affirmance of the denial of SSI. *See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 22. On January 8, 2016, Plaintiff opposed the Commissioner's motion and cross-moved for a judgment on the pleadings requesting that the Court reverse the Commissioner's determination that he is not disabled and that the matter be remanded for further administrative proceedings. *See* Mem. of Law in Supp. of Pl.'s Cross-Mot. for a Remand & for New & Material Ev. ("Pl. Mem."), Dkt. Entry No. 23. The Commissioner replied on February 5, 2016. *See* Mem. of Law in Opp. to Pl.'s Cross-Mot. for J. on the Pleadings & in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Reply"), Dkt. Entry No. 25. Plaintiff responded on February 19, 2016. *See* Reply Mem. of Law in Supp. of Pl.'s Cross-Mot. for J. on the Pleadings & in Opp. to Def.'s Mot. for J. on the Pleadings ("Pl. Reply"), Dkt. Entry No. 26.

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied; Plaintiff's motion is granted, and this action is remanded to the Commissioner for additional proceedings consistent with this Opinion and Order.

# BACKGROUND[4]

**A.    Medical and Educational Evidence**

Plaintiff was born in July 2005 and was seven years old on December 14, 2012, the date his father applied for SSI benefits on his behalf. R. at 150. At the time of the application, Plaintiff lived with his father in Queens. *Id*. at 173. His biological mother did not live with them and made monthly child support payments. *Id*. at 151-52. The estrangement between Plaintiff's parents was connected to an investigation by the New York City Administration for Children's Services ("ACS") and an associated proceeding in the New York State Family Court. *See Id*. at 210, 257-58. Sometime in 2008, Mr. Woodson "received custodianship from [Plaintiff's biological] mother who was being investigated by [ACS] for sexual and emotional abuse." *Id*. at 210. According to Mr. Woodson, Plaintiff's mother began abusing the child when he was just a year old. *Id*.

In October 2010, while Plaintiff was enrolled in kindergarten, ACS submitted a Student Information for Child Welfare Services Form to Plaintiff's school. *Id*. at 262-64. ACS indicated that Plaintiff was "involved in an ACS child welfare investigation" and, as such, ACS sought information in order to make an "accurate assessment of" Plaintiff's safety. *Id*. at 262. In the portion of the form completed by school personnel, responses indicate that Plaintiff rated "good" in relationships with teachers, maturity, leadership ability, motivation to learn, work habits, and physical care. *Id*. at 263. Despite this overall positive assessment, school personnel cautioned that Plaintiff was "physical with other children," had "poor" relationships with other children, and, in one incident, kicked, hit, punched, and squeezed other children. *Id*.

---

[4] Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of said record. As such, the following background is taken substantially from "Statement of Facts" section of the Commissioner's brief, except as otherwise indicated.

Dr. Robert Lancer ("Dr. Lancer") conducted a consultative psychiatric examination of Plaintiff on May 10, 2012. *Id*. at 221-24. Plaintiff was six years old at the time and receiving a first grade education. *Id*. at 221. He lived with his father, stepmother, and sibling; his stepmother accompanied him to the appointment. *Id*. She reported that Plaintiff's academic performance was fair. *Id*. He could dress, bathe, and groom himself like a normal six-year-old child, and helped clean up his toys. *Id*. at 223. He saw a neurologist once a month, a psychologist once a week, and took Adderall for his Attention Deficit Hyperactivity Disorder ("ADHD"). *Id*. at 221. His sleep habits were normal, but he experienced a loss in appetite and tended to lose his temper easily. *Id*. Generally, Plaintiff failed to pay attention or follow instructions, made careless mistakes, was disorganized, and had problems behaving at school. *Id*. His stepmother also stated that he would get anxious and pace around the floor. *Id*. During the examination, Dr. Lancer found Plaintiff cooperative, and noted that his manner of relating, social skills, and overall presentation were appropriate for his age. *Id*. at 222. Plaintiff's speech, thought processes, and affect were also normal. *Id*. His attention, concentration, and recent and remote memory skills were all mildly impaired due to emotionality, but his insight and judgment were appropriate for his age. *Id*. at 223.

Dr. Lancer diagnosed Plaintiff with attention hyperactivity disorder, combined type, and, based on his examination, opined that Plaintiff could follow and understand simple directions and instructions, and complete age appropriate tasks. *Id*. at 223-24. Plaintiff had difficulty maintaining appropriate social behaviors, responding to appropriate changes in the environment, and learning in accordance with cognitive functioning. *Id*. at 223. According to Dr. Lancer, Plaintiff's difficulties were caused by distractibility. *Id*. Furthermore, Dr. Lancer observed that these symptoms were consistent with psychiatric problems that could interfere significantly with his ability to function on a daily basis. *Id*. Dr. Lancer found that, nevertheless, Plaintiff could ask

4

questions and request assistance in an age appropriate manner, be aware of danger and take adequate precautions, and interact adequately with peers and adults. *Id*. That same day, May 10, 2012, Plaintiff's stepmother took him to see Dr. Ilene Friedman ("Dr. Friedman") for a consultative pediatric examination. *Id*. at 225-29. Plaintiff was doing well in school and did his homework, despite having difficulty focusing and staying on task. *Id*. at 226. He enjoyed watching television, listening to music, and playing with his siblings. *Id*. Dr. Friedman's examination revealed generally unremarkable findings, with the exception of his level of activity. *Id*. at 227. Dr. Friedman found Plaintiff was very active and unable to stay still, but appeared to have a normal attention span for his age. *Id*. She diagnosed ADHD and Post-Traumatic Stress Disorder ("PTSD"), but still determined that Plaintiff could participate in all educational, social, and recreational activities. *Id*. at 228.

On June 6, 2012, Dr. P. Kudler ("Dr. Kudler"), a State agency psychiatric consultant, reviewed the evidence of record and determined that Plaintiff's ADD and PTSD were severe but did not meet, medically equal, or functionally equal the Listings (20 C.F.R. Pt. 404, Subpt. P, App'x 1). *Id*. at 230-35. In deciding whether Plaintiff's impairments functionally equaled the Listings, Dr. Kudler evaluated Plaintiff's functioning within the six "domains" found at 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). *Id*. at 232-33. In the domain of acquiring and using information, Dr. Kudler determined Plaintiff's limitation was less than marked, although he occasionally demonstrated problems understanding new material. *Id*. at 232. Dr. Kudler similarly found that Plaintiff's limitation was less than marked in the domain of attending and completing tasks, despite the fact that he was distractible and sometimes had problems focusing. *Id*. Dr. Kudler also observed that Plaintiff demonstrated a less than marked limitation in the domain of interacting and relating to others, even though Plaintiff demonstrated inappropriate behavior and his interpersonal skills

were problematic at times. *Id*. He had no limitations in the remaining domains of moving and manipulating objects, caring for himself, and health and physical wellbeing. *Id*. at 234.

On December 20, 2012, Plaintiff saw Dr. Rehner at the Child Center of New York ("Child Center") for a mental status examination. *Id*. at 284-89. Dr. Rehner's examination showed that Plaintiff was hyperactive, fidgety, restless, and tense, but that his level of activity was within normal limits. *Id*. at 285. Plaintiff was diagnosed with ADHD and PTSD. *Id*. at 289. Dr. Rehner assessed Plaintiff's Global Assessment of Functioning ("GAF") at a score of 61-70. *Id*.

Mr. Woodson accompanied Plaintiff to another examination with Dr. Lancer on January 21, 2013. *Id*. at 209-14. Plaintiff was seven years old. *Id*. at 209. He was in the second grade, still enrolled in a regular school curriculum, and doing well. *Id*. He saw a psychologist once a week for one hour and took 30 milligrams of Vyvanse. *Id*. Mr. Woodson reported that Plaintiff displayed deliberate destructiveness, in addition to angry and aggressive behavior with adults and peers. *Id*. Mr. Woodson also stated that Plaintiff's attention, concentration, and hyperactivity symptoms were under control with medication. *Id*. Plaintiff could dress, bathe, and groom himself in accordance with his age. *Id*. at 211. His friendships and relationships with family members were difficult, and he spent his days watching television and playing video games. *Id*. at 211-12.

Dr. Lancer diagnosed Plaintiff with ADHD combined type, and conduct disorder childhood onset. *Id*. at 212. Based on his examination, Dr. Lancer opined that Plaintiff could attend to, follow, and understand age appropriate directions and complete age appropriate tasks. *Id*. Plaintiff had difficulty responding to changes in the environment, maintaining appropriate social behavior, learning in accordance with cognitive function, and asking questions and requesting assistance in an age appropriate manner, but he could be aware of danger and take necessary precautions. *Id*. He had moderate difficulty interacting with peers and adults, especially at home. *Id*. Dr. Lancer

recommended that Plaintiff continue with psychological treatment and seek out individual psychiatric intervention. *Id*. Dr. Lancer also recommended family training, parent effectiveness training, and medical follow up. *Id*.

On January 25, 2013, Plaintiff was examined by Dr. Zia Ahmed ("Dr. Ahmed"). *Id*. at 215-16. She found Plaintiff alert, cooperative, and responsive during the examination. *Id*. at 215. His comprehension, motor function, and gait were normal, his mood was good, and his speech was clear and fluent. *Id*. Dr. Ahmed determined that Plaintiff's dose of Vyvanse had been reduced to 30 milligrams the previous month due to oversensitivity with improvement. *Id*. His appetite had decreased while on medication. *Id*. Mr. Woodson reported that Plaintiff's attention had been fair, and that there were no complaints from school. *Id*. Dr. Ahmed recommended that Plaintiff continue the same dosage of Vyvanse to treat his ADHD. *Id*.

On February 19, 2013, State agency psychology consultant Dr. Marion Graf ("Dr. Graf") reviewed the evidence of record and found that Plaintiff had ADHD which, while medically severe, did not meet, or medically or functionally equal, an item in the Listings. *Id*. at 86-87. She found that Plaintiff showed no limitations in the domains of acquiring and using information, moving about and manipulating objects, or health and physical wellbeing. *Id*. at 86-87. Dr. Graf found that Plaintiff had less than marked limitation in the domain of interacting and relating with others, although he did have difficulty with peers. *Id*. at 87. As to the domain of caring for oneself, Dr. Graf determined that Plaintiff had a less than marked limitation, despite his mood issues. *Id*. Finally, Dr. Graf found a marked limitation in the domain of attending and completing tasks, noting Plaintiff's ADHD diagnosis, the fact that he was taking Vyvanse, and comments from Mr. Woodson that the medication helped control the ADHD. *Id*. at 86-87.

On June 23, 2013, Plaintiff's second grade teacher completed a form concerning his functioning. *Id.* at 246-48. His teacher noted that, in the previous month, the following aspects of Plaintiff's conduct were "just a little true" or occurred occasionally: inattentiveness or easily distracted, a disturbance to other children, difficulty remaining still, leaving his seat in class when others remained seated, fidgety, only paying attention to things that interest him, temper outbursts or unpredictable behavior, excitable or impulsiveness, and restlessness. *Id.* at 247. No other behavioral issues were noted. *Id.* at 247-48. Plaintiff was not defiant, had not refused to comply with adult requests, and did not argue with adults. *Id.* at 247. His teacher also noted that Plaintiff had a perfect score on a recent reading test and scored 96% on a recent math test. *Id.* at 248. Plaintiff functioned well in class, participated in discussions, and completed his work. *Id.* He would get distracted at times during math and independent reading. *Id.* He could be reserved with other children, and told the teacher when other children did not do the right thing. *Id.* He occasionally got distracted and played with his neighbor or items on his desk, but he cooperated with teachers and seemed to understand their authority. *Id.* Although Plaintiff had struck another student earlier in the spring and made inappropriate drawings in the fall, he tended to provide a "very good" example for other children. *Id.* He was "very bright, articulate," and knew the "right" thing to do in school. *Id.*

On November 13, 2013, Licensed Clinical Social Worker Reshma Shah ("Ms. Shah") of the Child Center evaluated Plaintiff. *Id.* at 275-80. Ms. Shah's notes reveal that Plaintiff was anxious about visitation with his birth mother and an upcoming custody hearing. *Id.* at 278. His behavior at school and home had improved. *Id.* at 276. Plaintiff was taking 30 milligrams of Vyvanse and 25 milligrams of Risperidone. *Id.* at 277.

On November 21, 2013, Dr. Sandeep Dhingra ("Dr. Dhingra") of the Child Center examined Plaintiff. *Id*. at 281-83. Plaintiff's father and stepmother reported that he remained symptomatic at home. *Id*. at 281. Vyvanse was discontinued because it was not fully effective and decreased Plaintiff's appetite. *Id*. Plaintiff spoke in incomplete sentences, had a poor attention span, and had mild limitation in judgment and insight. *Id*. at 282. Dr. Dhingra did not find any other abnormalities, but noted Plaintiff's ADHD diagnosis. *Id*. Dr. Dhingra found that Plaintiff's GAF score had gone up from 50-60 the previous year to 60-70. *Id*. at 283. He prescribed 18 milligrams of Methylphenidate.

In an undated form, Plaintiff's therapist, Licensed Clinical Social Worker Neelam Ahuja ("Ms. Ahuja"), from the Child Center indicated that he had been diagnosed with ADHD and received weekly therapy. *Id*. at 249. Plaintiff had behavior issues and was not compliant with the rules at school, but he was cooperative in therapy. *Id*. He took 18 milligrams of Methylphenidate in the morning. *Id*.

Dr. Abby Greenberg, a medical expert who testified at the hearing on July 15, 2014, opined that Plaintiff had the following combination of impairments: ADHD; conduct disorder; and anxiety disorders (specifically PTSD). *Id*. at 73. Dr. Greenberg testified that the combination of impairments was severe, but it did not meet, or medically or functionally equal, any contained in the Listings. *Id*. To evaluate ADHD, Dr. Greenberg specifically considered Listing 112.11. *Id*. at 73-74. She explained that the record, including treatment notes from Plaintiff's therapist and psychiatrist, as well as notes from Plaintiff's teacher, did not show that Plaintiff had marked impulsivity, inattention, and hyperactivity, as required by the Listing 112.11. *Id*. 73-74. Additionally, Plaintiff had no marked impairment in cognitive and communicative function for his age, or marked impairments in social functioning, personal functioning, or concentration,

9

persistence, or pace. *Id*. at 74. Dr. Greenberg also testified that while it appeared that Plaintiff's medication for ADHD had increased over the relevant period of time, the increase was a relatively low dosage for his age. *Id*.

Dr. Greenberg similarly testified that Plaintiff did not meet or medically equal Listing 112.08 (personality disorder) because the evidence did not show that he had a pervasive inflexible maladaptive personality. *Id*. at 75. Beyond that, Dr. Greenberg determined that the impairment did not functionally equal Listing 112.08 because Plaintiff did not have a marked impairment in age appropriate communicative functioning, social functioning, or personal functioning. *Id*.

Finally, Dr. Greenberg testified that Plaintiff's PTSD did not meet, medically equal, or functionally equal Listing 112.06 (anxiety). *Id*. at 76. She explained that, although the consultative examiner stated that Plaintiff had psychiatric problems that could significantly interfere with his ability to function on a daily basis, that examiner only conducted a one- to two-hour evaluation. *Id*. at 78-79. She explained that Plaintiff's "therapist," who saw him on a weekly basis, observed his symptoms change from "moderate" to "mild" in a period of two years.[5] *Id*. at 79. Dr. Greenberg stated that the treatment notes from December 2011 to November 2012 showed that Plaintiff had only moderate to mild symptoms or moderate to mild impairments in social and educational functioning. *Id*. at 74, 76.

Dr. Greenberg determined that Plaintiff had a less than marked limitation in five of the six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) caring for oneself; and (5) health and physical wellbeing. *Id*. at 77. She found that Plaintiff had no limitations in the last domain of moving and manipulating objects. *Id*.

---

[5] Based on the record before the Court, it appears that Dr. Greenberg was referring to Dr. Dhingra's notes. *See* R. at 283.

**B.      Testimonial Evidence**

Mr. Woodson completed a function report for Plaintiff on December 27, 2012. *Id*. at 159-70. In that document, Mr. Woodson indicated that Plaintiff had no problems communicating, learning, taking care of his personal needs, or paying attention and sticking with a task. *Id*. at 164-65, 168-69. Although Plaintiff's impairment affected his behavior with other people, he had friends, could make new friends, and generally got along with teachers and other adults. *Id*. at 167. In a disability report, Mr. Woodson indicated that Plaintiff was being treated by Dr. Ahmed for ADHD and PTSD, that his last appointment had been on December 20, 2012, and that he had an appointment scheduled for January 2013. *Id*. at 174. Mr. Woodson also indicated that Plaintiff was now in the second grade and in special education classes. *Id*. at 177

On April 11, 2013, Plaintiff's stepmother submitted an updated disability report. *Id*. at 182-86. Plaintiff had resumed visitations with his biological mother, which had triggered PTSD symptoms. *Id*. at 182. Plaintiff's anger and mood swings had increased since February 2013, and he had stabbed another student with a pencil. *Id*. His home behavior and focus deteriorated. *Id*. Plaintiff took Risperidone, was seeing the school guidance counselor, and had weekly therapy sessions. *Id*.

Mr. Woodson also testified at two administrative hearings before the ALJ. At the first, held on January 21, 2014, Mr. Woodson testified that Plaintiff lived with him and one other sibling. *Id*. at 57. He explained that Plaintiff had difficulty in school, disrupted class, and had problems controlling his anger. *Id*. at 55-56. He attacked other students. *Id*. at 56. Mr. Woodson explained that his son had been diagnosed with PTSD, was under the care of a psychiatrist, and was taking Methylphenidate. *Id*. Plaintiff's supervised visits with his birthmother affected him negatively. *Id*. at 57. He had difficulty concentrating and completing tasks, and would not get ready for school on

his own in the morning. *Id.* at 55, 58. Mr. Woodson testified that his son was very intelligent, in regular education classes, and received weekly counseling at the school. *Id.* at 61. Before adjourning the hearing, the ALJ asked Mr. Woodson to sign a waiver on behalf of Plaintiff so that the ALJ could obtain additional records concerning Plaintiff's alleged disabilities. *Id.* at 62; *see also Id.* at 142-47.

Mr. Woodson testified again at the second hearing held on July 15, 2014. *See Id.* at 65-81. He explained that Plaintiff's doctors had decided to increase the Methylphenidate dosage to 36 milligrams. *Id.* at 67. The medication worked for approximately two to three weeks before an upward adjustment is required to control Plaintiff's disruptive behavior at school. *Id.* at 68. When the medication worked, Plaintiff was able to focus in school; when it wore off, he would be disruptive in class. *Id.* at 69-70. Mr. Woodson reiterated that when Plaintiff visited his biological mother, he would be "off" for a couple of days immediately following those visits. *Id.* at 70-71. Plaintiff still had difficulty staying focused to get ready for school in the morning. *Id.* at 72.

## APPLICABLE LAW

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, this Court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). "'Substantial evidence' is 'more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera*, 697 F.3d at 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the Court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . [R]egulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004) (internal citations committed). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (internal citations omitted). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceeding[s]." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (internal citations and quotation marks omitted).

**B.     Governing SSA Regulations for Defining Childhood Disability**

To qualify for SSI benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 75 (2d Cir. 2009). The SSA has provided a

three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924(a); *see also George*, 568 F.3d at 75.

First, to qualify for benefits, "the child must not be engaged in a 'substantial gainful activity.'" *George*, 568 F.3d at 75 (quoting 20 C.F.R. § 416.924(a)). Second, the ALJ must consider whether the child has "'a medically determinable impairment(s)' that is 'severe' in that it causes 'more than minimal functional limitations.'" *Id*. at 75 (quoting 20 C.F.R. § 416.924(c)). Third, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting 20 C.F.R. § 416.924(c), (d); 20 C.F.R. Pt. 404, Subpt. P).

Under the third step, to demonstrate functional equivalence to an impairment in the Listings, the child must exhibit "marked" limitations in two of six domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a). These six domains consider a child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (6) health and physical wellbeing. 20 C.F.R. §§ 416.926a(a)-(b). A "marked" limitation "''is more than moderate' but 'less than extreme'' and 'interferes seriously with' a child's 'ability to independently initiate, sustain, or complete activities.'" *George*, 568 F.3d at 75 (quoting 20 C.F.R. § 416.926a(e)(2)(i)). An "extreme" limitation is "''more than marked'' and 'interferes very seriously with' a child's 'ability to independently initiate, sustain, or complete activities.''" *George*, 568 F.3d at 75 (quoting § 416. 926a (e)(3)).

## DISCUSSION

**A.    The Decision**

On August 12, 2014, the ALJ issued the Decision denying Plaintiff's application for SSI

benefits. R. at 4-29. The ALJ followed the three-step procedure outlined above to determine that

Plaintiff was not disabled. *Id*. at 12, 20-25. At the first step, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since December 14, 2012, the application date. *Id*. at 12. At

the second step, the ALJ determined that Plaintiff had the following medically determinable severe

impairments: "Attention Deficit Hyperactivity Disorder ('ADHD'), Post Traumatic Stress

Disorder ('PTSD')[,] Conduct Disorder[,] and asthma."[6] *Id*. At step three, the ALJ found, based

upon the testimony of Dr. Greenberg, that Plaintiff's impairments "do not meet or medically equal

the criteria of a listed impairment." *Id*.  As for functionally equaling an impairment in the Listings,

the ALJ considered "all relevant evidence in the case record," and ultimately determined that

Plaintiff had no limitation in the domain of moving and manipulating objects and had a less than

marked limitation in the remaining domains. *Id*. at 13-25. Consequently, since Plaintiff did not

have an impairment or combination of impairments that were "marked" in two domains of

"extreme" in one, the ALJ concluded that Plaintiff did not have any impairment functionally

equaling one contained in the Listings. *Id*. at 25.

**B.    Analysis**

The Commissioner moves for judgment on the pleadings, asking this Court to affirm the

denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to find

that Plaintiff was not disabled and that the factual findings were supported by substantial evidence.

---

[6] While Plaintiff initially had included asthma as an alleged impairment, he does not challenge the ALJ's determination that his asthma does not meet, or medically or functionally equal, an item in the Listings. *See generally*, Pl. Mem.

*See generally*, Def. Mem. Plaintiff cross-moves for judgment on the pleadings, opposing the Commissioner's motion and seeking remand, arguing that: (1) the ALJ failed to properly weigh the medical evidence; and (2) there is new and material evidence that requires remand.[7] *See generally*, Pl. Mem. Upon review, the Court finds that the ALJ did not properly weigh the medical evidence and failed to develop the record as to Plaintiff's treating sources.

### i.    Unchallenged Findings

The ALJ's findings at steps one and two are unchallenged. *See generally*, Def. Mem.; Pl. Mem.; Def. Reply; Pl. Reply. Upon a review of the record, the Court concludes that the ALJ's findings as to steps one and two are supported by substantial evidence.

### ii.    The ALJ Failed to Properly Weigh the Medical Opinions

Plaintiff argues that the ALJ erred in giving too little weight to the opinion from Dr. Lancer and in giving too much weight to the opinions from Drs. Greenberg, Kudler, Dhingra, and Ms. Ahuja. Pl. Mem. at 16-17. The Court agrees that there is error in the ALJ's analysis.

In evaluating every medical source's opinion, the Regulations require that the ALJ specifically consider: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the source is a specialist; and (5) any factors a claimant or others bring to the Commissioner's attention that would support or contradict the opinion. *See* 20 C.F.R. §§ 416.927(c)(2)-(6). "Unless . . . a treating source's medical opinion [is given] controlling weight under paragraph (c)(2) of this section," all of the aforementioned factors are considered in assessing any medical opinions. 20 C.F.R. §§ 416.927(c). Some findings, such as the ultimate

---

[7] In his reply papers, Plaintiff advances additional arguments that the ALJ generally failed to develop the record and failed to properly credit Mr. Woodson's testimony. *See* Pl. Reply at 1-7. The Court does not consider these arguments because "new arguments may not be made in a reply brief." *Van Orden v. Astrue*, No. 09-CV-81 (GLS) (VEB), 2010 WL 841103, at *13 (N.D.N.Y. Mar. 11, 2010) (internal citations and quotation marks omitted).

finding of whether an individual is "disabled" under the Act, are "reserved to the Commissioner" and, therefore, are never given controlling weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal citations and quotation marks omitted). While specifically outlining the consideration of these factors is helpful to a reviewing court, "where the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (internal citations and quotation marks omitted).

First, as to Dr. Greenberg's opinion, the Court finds no error in the ALJ's assessment. Although Dr. Greenberg did not examine Plaintiff, the ALJ noted that she was a pediatric medical expert who had reviewed all the evidence in the record. R. at 18. Furthermore, over the course of approximately two pages, the ALJ reviewed Dr. Greenberg's testimony and the documents in the record upon which she relied in arriving at her conclusions. *Id*. at 18-19. In opposition, all Plaintiff offers is a conclusory argument that the ALJ "gave too much weight to the medical expert." Accordingly, the Court rejects Plaintiff's argument concerning the ALJ's analysis of Dr. Greenberg's medical opinion, as the record supports ALJ's determination.

In contrast, the Court finds error in the ALJ's assessment of Dr. Kudler's opinion. Plaintiff argues that the ALJ gave "too much weight to . . . the non-examining doctor who completed a form in June 2012." Pl. Mem. at 16. The Court assumes this refers to Dr. Kudler. The ALJ noted that Dr. Kudler was a non-examining psychiatrist whose opinion "reflects what is indicated in the record," but he did not indicate what evidence supported Dr. Kudler's opinion aside from that adduced by Dr. Greenberg. R. at 20. There is no reference to any specific document beyond a general statement that Dr. Kudler's opinion reflects the fact that Plaintiff's "symptoms and

17

behaviors seem to have an ebb and flow to them." *Id*. Accordingly, the Court finds that the ALJ failed to analyze all relevant factors in arriving at his determination as to the import of Dr. Kudler's evaluation.

Similarly, Plaintiff argues that the ALJ committed error in giving "too little weight" to Dr. Lancer's assessments. Pl. Mem. at 16-17. The ALJ recounted thoroughly Dr. Lancer's two examinations alongside the associated findings. R. at 15-16. Yet, despite the methodical explanation of Dr. Lancer's findings, the ALJ determined that his opinions only were entitled to "some weight" because "the nature and extent of the limitations attributed to [Plaintiff] are inconsistent" with various other reports in the record. *Id*. at 20. The problem here is that the ALJ did not specifically identify how Dr. Lancer's conclusions contradicted those in other reports. Without a more robust explanation on this point, the Court must agree that the ALJ failed to analyze all relevant factors in arriving at his conclusion concerning the weight of Dr. Lancer's opinions. *See Toomey v. Colvin*, No. 15-CV-730 (FPG), 2016 WL 3766426, at *3 (W.D.N.Y. Jul. 11, 2016).

Plaintiff also contends that the ALJ erred in giving "great weight" to the opinions of Dr. Dhingra, and Ms. Ahuja. Pl. Mem. at 16. While the ALJ emphasized that Dr. Dhingra and Ms. Ahuja "have an established two-year chronological history with" Plaintiff, and even highlighted the fact that Ms. Ahuja met "with [Plaintiff] once a week," he only accorded their opinions "great weight." R. at 20. Given the history and consistency with which Dr. Dhingra and Ms. Ahuja meet with Plaintiff, they would qualify as "treating physicians" under the Regulations, and, thus, their opinions are entitled to controlling weight.

An individual's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient

relationship with the individual." *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations and quotation marks omitted). If the ALJ does not give the treating physician's opinion controlling weight, he must explain his decision applying the factors outlined at 20 C.F.R. §§ 416.927(c)(1)-(6). Although there is no indication in the record that Ms. Ahuja had a medical degree, "courts in this Circuit have concluded that the treating physician rule applies to the opinions of licensed social workers," like Ms. Ahuja. *Jones v. Comm'r of Soc. Sec.*, No. 13-CV-4785 (RRM), 2015 WL 5579847, at *16 (E.D.N.Y. Sept. 22, 2015) (citing *Jacobi v. Colvin*, No. 14-CV-3827 (PAE) (JCF), 2015 WL 4939617, at *10 (S.D.N.Y. Aug. 19, 2015)).

There is no question that the record establishes a regular, consistent treating relationship between Plaintiff and both Dr. Dhingra and Ms. Ahuja. The ALJ identified Dr. Dhingra as Plaintiff's "treating psychiatrist," and acknowledged the length and depth of these relationships in the Decision. R. at 18, 20. However, he determined that these individuals' opinions were entitled to "great weight," only. *Id.* at 20. In order to give a treating physicians' opinion anything less than controlling weight, the ALJ must apply the factors outlined in 20 C.F.R. §§ 416.927(c)(1)-(6). He did not do so, and only referenced these sources with passing conclusory statements. *See Id.* at 18, 20. This failing, alone, requires the Court to remand this matter for further administrative proceedings. *Toomey*, 2016 WL 3766426, at *3.

The lack of analysis concerning the opinions from Dr. Dhingra and Ms. Ahuja is compounded by the fact that the ALJ did not sufficiently develop the record for those treating

sources. "The ALJ's adherence to the treating physician rule operates in tandem with the affirmative duty to develop a full and fair record." *Cairo v. Comm'r of Soc. Sec.*, No. 11-CV-3839 (DLI), 2013 WL 1232300, at *6 (E.D.N.Y. Mar. 26, 2013) (citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512(d)-(f)). "As part of the ALJ's fundamental duty to develop the record, he is responsible for seeking additional information when the treating physician has not provided an adequate basis to determine a claimant's disability." *Id.* (internal citation omitted). The ALJ did not fulfill that duty here.

Despite the recognition that Dr. Dhingra and Ms. Ahuja had been treating Plaintiff consistently for approximately two years, the record contains less than five pages directly related to their care. The sole page from Ms. Ahuja is undated, and the others appear to be from a single, twenty-minute meeting Plaintiff had with Dr. Dhingra in November 2013. R. at 249, 281-83. What is more, these pages consist of nothing more than generalized statements and checked boxes. *Id.* at 249, 281-83. This is insufficient to meet the ALJ's burden, particularly where, as here, Plaintiff appeared *pro se*. When a claimant appears *pro se*, "the ALJ [must] make every reasonable effort to obtain not merely the medical records of the treating physician[,] but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability." *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (internal citation omitted).

The Court notes that the ALJ sent a subpoena to Child Care and received a response. R. at 272-90. The subpoena requested "all" records and a "medical source statement as to what [Plaintiff] can still do despite his alleged impairment." *Id.* at 272. The documents produced did not contain an opinion as to what Plaintiff could and could not do, and undoubtedly do not reflect two years of treatment. In such a scenario, "[i]f the documents received lack any necessary information, the ALJ should recontact the treating physician." *Martinex ex rel. Ramierz v. Astrue*, No. 07-CV-

8848 (HB), 2008 WL 4833016, at *8 (S.D.N.Y. Nov. 5, 2008) (internal citations and quotation marks omitted). Upon a review of the record, it appears that the ALJ took no additional steps after receiving the inadequate documents. *See generally*, R.

On remand, the ALJ must develop the record as to the two years of treatment Plaintiff received from Dr. Dhingra and Ms. Ahuja. He also must seek opinions from these individuals concerning Plaintiff's alleged impairments and remaining abilities. Upon securing this information, the ALJ must secure a revised opinion from Dr. Greenberg, as the evidence in the record will have changed. After that, the ALJ must evaluate the weight assigned to the opinions from Drs. Greenberg, Kudler, Lancer, and Dhingra, and Ms. Ahuja using the factors outlined in 20 C.F.R. §§ 416.927(c)(1)-(6). The Court acknowledges that the ALJ might very well be correct in his ultimate conclusions, but he must explain his reasoning for the weight assigned to these sources in accordance with the Regulations.

### iii.    *Presentation of New Evidence*

Plaintiff also argues that he is entitled to a remand and further proceedings in order for the ALJ "to consider the impact of the subsequently obtained medical and educational records." Pl. Mem. at 17. These new documents consist of records: (1) from St. John's University in 2015 (Pl. Mem. at Exs. A, D); (2) from Elmhurst Hospital in 2009 and 2015 (Pl. Mem. at Ex. B); (3) from Child Center in 2011, 2013, and 2015 (Pl. Mem. at Ex. C); and (4) a Summary Forensic Report completed by a psychologist in connection with the New York State Family Court matter, composed of information from 2010 and 2011 (Pl. Mem. at Ex. E). *See* Pl. Mem. at 6-11. Upon inspection, it appears that the Child Center records from 2011 and 2013 were prepared by Dr. Dhingra and Ms. Ahuja. *See generally*, Pl. Mem. at Ex. C. In light of the Court' decision to remand this proceeding to the ALJ in order to develop the record as to Dr. Dhingra and Ms. Ahuja's

treatment of Plaintiff, the portion of Plaintiff's application to remand the proceeding for the ALJ

to consider newly provided records from Child Center 2011 and 2013 is moot.

Remand for consideration of additional evidence is appropriate if:

> (1) the proffered evidence is new and not merely cumulative of what
> is already in the record; (2) the proffered evidence is material,
> meaning that it is . . . relevant to the claimant's condition during the
> time period for which benefits were denied . . . probative . . . and
> reasonably likely to have influenced the Commissioner to decide the
> application differently; and (3) good cause exists for failure to
> present the evidence earlier.

*Mulrain v. Comm'r of Soc. Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

While the Court finds that all of the proffered evidence is new, the Court finds that all of

the records dated after August 12, 2014 are immaterial. "[N]ew evidence is only material if it is

relevant to the . . . condition during the period for which benefits were denied, spanning from the

alleged onset date through the ALJ's decision." *Felix v. Astrue*, No. 11-CV-3967 (KAM), 2012

WL 3043203, at *12 (E.D.N.Y. Jul. 24, 2012). In arguing that the submitted evidence is "material,"

Plaintiff speaks broadly and repeats the conclusory statement that all of the evidence establishes

his impairments are "far more severe" than previously determined by the ALJ. *See* Pl. Mem. at 20

-22. However, records created after the Decision do not provide a basis for remand and can only

be considered in a new application for benefits. *See Felix*, 2012 WL 3043203, at *13 ("[N]ew

evidence indicating only that the plaintiff's condition has worsened since the ALJ's decision does

not meet the materiality requirement."); *Camacho v. Comm'r of Soc. Sec.*, No. 04-CV-2006 (FB),

2005 WL 3333468, at *4 (E.D.N.Y. Dec. 6, 2005) (noting that a plaintiff "is, of course, free to

reapply for benefits based on conditions that have developed or worsened since the ALJ rendered

his decision."). Accordingly, the Court denies Plaintiff's application as to any records created after

August 12, 2014.

The remaining documents to be considered consist of records from: (1) Elmhurst Hospital in 2009; and (2) the New York State Family Court in 2010 and 2011. These items are within the proper timeframe to be considered "material" and, as such, the Court turns to the records' substance to decide whether they are "probative" and "reasonably likely to have influenced the Commissioner to decide the application differently." The records from Elmhurst Hospital in 2009 consist of five pages. Pl. Mem. at Ex. B, 29-33. They are from a single day in October 2009, and there is no mention of any of the alleged impairments at issue. *See generally, Id*. While the records speak to the alleged abuse Plaintiff suffered at the hands of his mother, Plaintiff has not proffered any basis for believing these records would have caused the ALJ to arrive at a different conclusion regarding Plaintiff's alleged psychological impairments and the Court cannot find any.

Similarly, the bulk of the Summary Forensic Report speaks to Plaintiff's parents, the allegations of abuse, and how Plaintiff and his sibling do not appear emotionally attached to their mother. *See generally*, Pl. Mem. at Ex E. There is a single page committed to evaluating Plaintiff, but it is unremarkable and seemingly supports the ALJ's conclusions. *Id*. at Ex. E, 14. The notes indicate that: (1) Plaintiff's academic performance has been average; (2) he achieved all developmental milestones on time; and (3) his motor, language, social, and cognitive growth were "average or advanced in comparison to other children." *Id*. There is passing reference to being active and aggressive, but these qualities can be gleaned easily from other parts of the record. *See, e.g.*, R. at 68, 70, 182, 209-10, 221-22, 226, 247-48, 263. There also are references to physical issues concerning bowel movements and bedwetting, but those issues do not appear anywhere else in the record and Plaintiff has not explained how these concerns relate to a five-year-old boy's psychological impairments to support a disability finding. *See generally*, Pl. Mem.; Pl. Reply.

Accordingly, the Court finds that the records from Elmhurst Hospital in 2009 and the Summary Forensic Report from 2010 and 2011 are not probative and would not have been "reasonably likely" to have resulted in a different decision from the ALJ. Plaintiff's motion to remand the proceeding for further administrative proceedings in order to consider the impact of subsequently obtained medical and educational records is denied.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied; Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied to the extent that the request for consideration of new medical evidence is denied; the decision of the Commissioner is reversed; and this matter is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion and Order. If Plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty (60) days of Plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004) (suggesting procedural time limits to ensure speedy disposition of Social Security cases upon remand by district courts). To the extent that Plaintiff's condition has declined or worsened since the date of the Decision, Plaintiff is free to reapply for benefits based on those conditions.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2017

                                              _____
                                                  /s/
                                         DORA L. IRIZARRY
                                            Chief Judge